ZAINEY, J.
JULY 27, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TRINITY YACHTS, INC. | CIVIL ACTION |
| VERSUS | NO. 04-2247 |
| TEIGNBRIDGE PROPELLERS, INC. AND<br>TEIGNBRIDGE PROPELLERS, LIMITED | SECTION "A"(2) |

**ORDER AND REASONS**

Before this Court is a **Motion to Compel Arbitration and For a Stay of Proceedings Pending Arbitration (Rec. Doc. 6)** filed by defendants Teignbridge Propellers, Inc. (hereinafter "Teignbridge US") and Teignbridge Propellers Limited (hereinafter "Teignbridge UK") (collectively referred to as "Teignbridge"). The motion is opposed by plaintiff, Trinity Yachts, LLC (hereinafter "Trinity"). For the reasons stated herein, Defendants' motion is DENIED.

FACTUAL BACKGROUND

The instant litigation is related to Trinity's purchase of custom-built propellers from Teignbridge. Trinity is a New Orleans-based shipbuilder that constructs "superyachts" using custom-built components, such as the propellers that are the subject of this litigation. In its communication with Teignbridge, Trinity dealt solely with Teignbridge US, which is based in

Oregon.  Nonetheless, Trinity was fully aware that the propellers were to be manufactured in England (by Teignbridge UK) and subsequently shipped to Louisiana.

Teignbridge's custom-built propellers were ordered for three Trinity vessels, which are identified by hull numbers during construction (*e.g.*, Hull No. T-024).  The three vessels relevant to this litigation are T-024, T-025, and T-027.  T-024 is a 142-foot tri-deck motor yacht that was designed with 48-inch diameter propellers.  T-025 is also a 142-foot tri-deck motor yacht, which was designed with 54-inch diameter propellers.  Finally, T-027 is a 180-foot motor vessel that was designed with 66-inch diameter propellers.

In May 2002, Trinity sent requests for proposals (RFPs) to various propeller manufacturers soliciting bids on custom-made propellers for Hulls T-024 and T-025. Teignbridge provided final quotes for each vessel in June 2002.  Subsequently, Trinity ordered the propellers necessary to outfit T-024 and T-025 from Teignbridge in July 2002.  Trinity had provided its customer for Hull No. T-024 a speed guarantee, however, at sea trials the yacht achieved speeds that were between half a knot and one knot less than the guaranteed speed.  In an effort to achieve the guaranteed speed, Trinity sent the Teignbridge propellers to Wild Cat Propellers for modification.  Even after modification, the vessel failed to perform to contract speed.  The vessel was nonetheless delivered to the customer.  Moreover, after sea trials for Hull No. T-025, Trinity alleges that the Teignbridge propellers caused vibrations and the vessel was also unable to meet contract speed.  Accordingly, Trinity replaced the propellers with those from a different manufacturer without considering Teignbridge's suggestions on how to minimize vibration on its propellers.

In January 2003, Teignbridge submitted a proposal for the tailshafts and propellers for Hull T-027. In February 2003, Trinity submitted a purchase order to Teignbridge for Hull T-027's custom-built propellers. Nonetheless, without ever testing the propellers, Trinity concluded that the propellers would pose the same problems as those propellers manufactured for Hulls T-024 and T-025. Trinity has failed to pay for or return the propellers or associated equipment related to Hull T-027.

## PROCEDURAL BACKGROUND

Trinity filed this suit alleging numerous state law causes of action against Teignbridge and alleges damages and costs in connection with the repair and replacement of the propellers of no less than $236,282.29. Teignbridge has also asserted a counterclaim for the unpaid purchase price of the propellers and alleges that the terms and conditions governing the agreements between the parties provides for arbitration of any disputes. Teignbridge argues that federal law compels enforcement of this arbitration clause such that this suit must be stayed and Trinity must present its claims against Teignbridge to arbitration.

## ISSUE PRESENTED

The International Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter the "Convention") is pertinent to the present matter. Specifically, its definition of "agreement in writing," which the Fifth Circuit has interpreted to include either: (1) an arbitral clause in a contract; or (2) an arbitration agreement that is (a) signed by the parties, or (b) contained in an exchange of letters or telegrams. *Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d 666, 669 (5th Cir. 1994). The parties agree that there has been no arbitration agreement that was either signed by the parties or contained in an exchange of letters or

3

telegrams.  Accordingly, the issue before this Court is whether an arbitral clause was incorporated into the contract between Trinity and Teignbridge.

## LAW AND ANALYSIS

The strong federal policy favoring arbitration does not apply to determination of whether there is va alid agreement to arbitrate between the parties.  *Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211 (5th Cir. 2003).  Furthermore, where the very existence of an agreement is disputed, a court must apply state-law principals of contract to decide at the outset whether an agreement to arbitrate was reached by the parties.  *Id.*  Louisiana's law of contracts is applicable to the Court's determination.

As part of the initial briefing of Defendants' motion, the parties analyzed this matter under the assumption that the agreement between Trinity and Teignbridge was a contract of sale.  Upon researching the matter, however, the Court ordered additional briefing and asked the parties to address the possibility that the contract between the parties was a contract to build.  Furthermore, the Court requested the parties to address the applicability of La. Civil Code article 2601.  Accordingly, the Court considers these two issues under the following individual subject headings.

### A Contract to Build

Louisiana Civil Code article 2756 provides defines a contract to build: "[t]o build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price." Three major factors distinguish the contract to build from the contract of sale.  *Herbert v. McDaniel*, 479 So. 2d 1029, 1032 (La.App. 3 Cir. 1985).  First, in a contract to build, the buyer has some control over the specifications of the object.  *Id.*  Second, the negotiations in a contract

4

to build occur before the object is constructed. *Id.* Finally, the contract to build contemplates that one party will supply the materials and will also provide the skill and labor necessary to build the desired object. *Id.*

In the present matter, all three of these factors support a finding that the parties entered into a contract to build. First, Trinity solicited bids from several propeller manufacturers seeking precision-machined custom propellers suitable to the specific hulls that were undergoing construction at its facility. Plaintiff's Memorandum in Opposition, p. 2. Trinity highlights the custom nature of these propellers by noting that each vessel's propellers are paired with its specific hull design and main engine package to obtain optimal speed with the minimum of noise and vibration. *Id.* A review of Trinity's RFP for Hull T-024 (*see* Plaintiff's Memorandum in Opposition, Exhibit A), makes it clear that Trinity had control over the specifications of the propellers. For instance, the second paragraph of the RFP provides:

> The propellers shall be 48" diameter (maximum), 5 bladed, NiBrAl with moderate screw. Noise is an important design factor on this vessel so the propellers shall have, as a minimum, anti-singing edges. The propellers shall be properly sized for the maximum power and RPM of the engines at the full load displacement of the vessel.

The RFP further outlined various design constraints and characteristics of Hull No. T-024. Notably, Trinity requested each manufacturer to provide certain information concerning the proposed propellers, one of which was lead time (*i.e.*, delivery time, to be discussed *infra*). The evidence clearly indicates that negotiations regarding the propellers for all three vessels occurred before Teignbridge built the propellers. Finally, it is also clear that Teignbridge was the sole provider of the labor and materials used to build the propellers. Accordingly, this Court finds that the parties entered into a contract to build.

5

Agreement to Arbitrate and La. Civil Code art. 2601

Louisiana Civil Cod article 1927 provides:

> A contract is formed by the consent of the parties established through offer and acceptance.
>
> Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
>
> Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

Professor Saul Litvinoff has written that to constitute a true offer, "a declaration of will must be sufficiently precise and complete so that the intended contract can be concluded by the offeree's expression of his own assent, thereby giving rise to that 'mutual consent' of the parties which, in practical terms, is indistinguishable from the contract itself." Saul Litvinoff, *The Law of Obligations in the Louisiana Jurisprudence*, Fifth Revised Edition (2000), p. 40. The concepts of offer and acceptance (as governed by the general obligations articles in the Civil Code) are applicable to the present dispute, regardless of whether the parties entered into a contract of sale or a contract to build. The distinction between the two contracts, however, is significant because of Civil Code article 2601, which provides:

> An expression of acceptance of an offer to sell a movable thing suffices to form a contract of sale if there is agreement on the thing and the price, even though the acceptance contains terms additional to, or different from, the terms of the offer, unless acceptance is made conditional on the offeror's acceptance of the additional or different terms. Where the acceptance is not so conditioned, the additional or different terms are regarded as proposals for modification and must be accepted by the offeror in order to become a part of the contract.
>
> Between merchants, however, additional terms become part of the contract unless they alter the offer materially, or the offer expressly limits the acceptance to the terms of the offer, or the offeree is notified of the offeror's objection to the additional

6

>terms within a reasonable time, in all of which cases the additional terms do not become a part of the contract. Additional terms alter the offer materially when their nature is such that it must be presumed that the offeror would not have contracted on those terms.

This article was revised in 1993 and went into effect in 1995, as part of Louisiana's adoption of the Uniform Commercial Code. Notably, there are no published cases that have applied this article since its revision. Nonetheless, the plain language and comments to the article make it clear that when merchants negotiate, unless the additional terms of a counteroffer materially alter the offer, then the additional terms in a counteroffer become a part of the offer, rather than a new offer. Notably, however, this article only applies to contracts of sale and does *not* apply to contracts to build.

Regardless of the effects of article 2601, Louisiana Civil Code article 1943 is relevant to the determination of how the contract was formed. The article provides: "An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer." This rule is commonly referred to as the mirror-image rule. As Teinbridge notes in its supplemental memorandum, the mirror image rule provides that for an acceptance to be conclusive for contract-formation it has to conform to the terms of the offer in every respect. Teignbridge's Supplemental Memorandum, p. 6 *quoting Acts of State of Louisiana*, *Volume II*, Regular Session 1993, Acts 598-1046 (1993). Teignbridge notes that Louisiana Civil Code art. 2601 modified the mirror image rule for contracts of sale between merchants because the rule ignored widespread modern business practices and was a trap for the unwary. *Id.* In the present case, however, the Court has found that the contract formed between the parties was one to build. Accordingly, as Louisiana Civil Code article 2601 applies only to contracts of sale, it cannot apply to the present matter. The

Court also notes that Teignbridge's reliance upon *Baldwin v. Bass*, 685 So. 2d 436, 439 (La.App. 2 Cir. 1996) is not relevant to the present matter because there is no evidence that the parties ever contemplated any specific *form* for the offer and acceptance to take place.

The parties offer conflicting evidence as to how the contract to build was formed.  First, Teignbridge argues that its price quotes constituted offers.  Notably, each price quote contained the following language: "TERMS OF SALE: This offer is subject to our standard terms and conditions of sale, a copy of which can be obtained upon request."  These standard terms and conditions, which were never provided to Trinity, contain the arbitration clause that is at issue.  As such, Teignbridge argues that Trinity's purchase orders constituted acceptance of its offers and that the arbitration clause was incorporated by reference.

Trinity disagrees, however, and alleges that the Teignbridge price quotes did not contain sufficeint detail to constitute an offer.  Alternatively, Trinity alleges that if the quotes could be considered offers, then the purchase orders constituted counter-offers that were accepted by Teignbridge by its performance.  Notably, Trinity also notes that it faxed acceptance forms to Teignbridge each time that it sent the purchase orders.  The acceptance forms contained the following language:

> Review Purchase Order terms, shipping requirements, quantity, and prices.  If any correction needs to be made, please note them on Purchase Order and fax back immediately.  Sign and return this acknowledgment by fax or mail.
>
> NOTE: If no corrections are indicated, or an acknowledgment is not returned to us, then we will assume the purchase order is correct and will not make any changes after shipment is received.

Notably, no corrections were made by Teignbridge.  After a careful review of the quotes and purchase orders for all three vessels, this Court finds that the purchase orders did not conform to the terms of the offer in every respect.

Specifically, the Court notes that Trinity modified the lead/delivery time for Hull Nos. T-024 and T-025 by two weeks (*i.e.*, changing both from 14 to 16 weeks to 12 to 14 weeks).  Notably, the Court finds unpersuasive Trinity's arguments that the price was indeterminate.  Regarding the propellers for Hull No. T-027, the Court notes that the Trinity purchase order denoted a price of $26,125 and that the price quote listed a price of $27,500.  Accordingly, not even looking beyond the price, it is clear that the T-027 purchase order was not in accordance with the terms of the price quote.

The Court finds that these differences, although minor, were significant enough (especially considering the fact that Trinity expressly requested a lead time in its RFP) that the price quotes were counter-offers and, therefore, that Teignbridge's performance was an acceptance of those counter-offers.  In short, this Court finds that the parties entered into a contract to build and that Trinity's purchase orders constituted offers that were accepted by Teignbridge's performance and the arbitration clause was not incorporated into the contract between the parties.  Accordingly, Defendants' **Motion to Compel Arbitration and For a Stay of Proceedings Pending Arbitration (Rec. Doc. 6)** is DENIED.

* * * * * * * *

9